# JOHN J. ORLANDO, P.C.
*Attorney at Law*
*8118 13th Avenue*
*Brooklyn, New York 11228*
*(718) 238-0020*
*(718) 238-0031*
*Email: orljohn@aol.com*

---

July 24, 2013

Hon. Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

        RE:    United States v. Xhevdet Cela
                     12-CR-367 (RJD)

Dear Judge Dearie:

      This letter is written in anticipation of the sentencing of Xhevdet Cela, which is scheduled to take place before Your Honor on August 9, 2013, at 10:00 a.m.

      For the reasons set forth herein, it is respectfully requested that the Court impose a sentence of Probation.  It is submitted that such a sentence would be reasonable and would be sufficient, but not greater than necessary, to satisfy the sentencing goals of 18 U.S.C. § 3553 (a).

      The parties had agreed in a plea agreement that Mr. Cela's advisory guidelines range was 57-71 months, assuming that Mr. Cela fell within Criminal History Category II.  However, it has been determined by the Probation Department in the Pre-Sentence Report ("PSR"), that Mr. Cela has a Criminal History Category of IV, making his advisory guidelines range 70 - 87 months.  Significantly, the Probation Department wrote that the "guideline range would appear more harsh and severe for this defendant relative to most others" (PSR, page 17).  Under 18 U.S.C. § 3561(a), Mr. Cela is eligible for probation.  Under the circumstances of this case, a sentence of Probation is sufficient to address the goals of sentencing.

**Facts**

      On July 13, 2011, Mr. Cela was arrested for distribution of oxycodone, in violation of 21 U.S.C. § 846.  One co-defendant, Igor Alterman, was arrested at the same time as Mr. Cela and was charged with the same crime.  Mr. Cela was released on a $150,000 collateral bond co-signed by relatives.  Mr. Alterman was similarly released.  As of the time of this writing, based on information and belief obtained in conversations with the prosecutor, Mr. Alterman remains at liberty and has not pled guilty.

This case involved an investigation based on claims made by a cooperating witness who claimed that a group of "Albanian males" were referring to themselves as members of a group called "K-MOB," and were distributing narcotics in Staten Island, New York. Law enforcement focused on Mr. Cela, who is an American-born person of Albanian descent, and Mr. Alterman, a Russian-American.

No discovery was provided in this case, as Mr. Cela admitted his guilt and offered to assist the government from the beginning of the case. A review of the SEALED AFFIDAVIT AND COMPLAINT IN SUPPORT OF APPLICATION FOR ARREST WARRANTS reveals that law enforcement had tape-recorded conversations of Mr. Cela and Mr. Alterman engaging in conversations with others in order to obtain and to sell quantities of oxycodone.

**Arrest and Plea**

Mr. Cela was cooperative with law enforcement authorities from the time of his arrest, admitting to them that he was addicted to oxycodone and was almost thankful that his arrest would help him address his addiction. Mr. Cela offered immediately to assist law enforcement in obtaining information that could lead to the arrest of other involved in oxycodone distribution.

On October 19, 2011, Mr. Cela entered into a proffer agreement with the prosecution, and was interviewed by the prosecutor and law enforcement officials in this case. He was allowed to stay at liberty in the community for more than one year before entering a plea before United States Magistrate Judge Steven M. Gold on November 20, 2012. Mr. Cela pled guilty, pursuant to a plea agreement with the government, to one count of Conspiracy to Distribute and Possess with Intent to Distribute Oxycodone, in violation of 21 U.S.C. § 846.

Mr. Cela's plea agreement with the government provided for a base level offense of 26. The Probation Department writes in its PSR that the base offense level should be 28, applying U.S.S.G. 2D1.1(a)(5). However, the defense maintains that the proper applicable statute is 2D1.1(c)(7), which the defense and prosecution had previously agreed was the applicable statute in the plea agreement. Mr. Cela should receive a 3 point downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), adjusting his offense level to 23.

At the time that Mr. Cela entered into his plea agreement, it was thought he would fall within Criminal History Category II. However, based on a more exhaustive search of Mr. Cela's criminal history, the Probation Department determined that Defendant falls within Criminal History Category IV. With an offense level of 23, and a Criminal History Category IV, the advisory guidelines range is 70 - 87 months. This places Mr. Cela within Zone C, making him eligible under the advisory guidelines to serve half of any sentence of incarceration under home or community confinement while under supervised release, as per U.S.S.G. § 5C1.1(e).

The plea agreement does not prohibit either party from seeking a sentence outside the Stipulated Guidelines Range. Under 18 U.S.C. § 3561(a), Mr. Cela is eligible for probation.

**Sentencing Law**

18 U.S.C. § 3553(a) directs sentencing courts to impose a sentence *sufficient, but not greater than necessary,* to comply with the purposes set forth in paragraph (2) thereof. Said purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the *minimally sufficient sentence,* 18 U.S.C. § 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant and the need to provide restitution to any victims of the offense. Since United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), of course, courts must consider *all* of these factors along with the now-advisory sentencing guidelines, and there is no question that the Court is entitled, after all relevant considerations, to impose a *non-guidelines sentence*. United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Thus, since Booker, the Court has the authority to impose a sentence below the advisory guidelines range, and weighing a lower sentence must be given equal consideration to factors other than the guidelines in imposing sentence.

Recent sentencing decisions by the Supreme Court have given district courts increasing discretion in imposing sentences *outside* the guidelines. The Court has underscored the merely advisory nature of the Sentencing Guidelines and has emphasized that any attempt to give special weight to the guidelines is contrary to its holding in Booker.

Appellate review of sentencing decisions is limited to a determination of the reasonableness of the sentence. See Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Rita v. United States, 551 U.S. 338 (2007). In reviewing the reasonableness of a non-guidelines sentence, the Court in Gall rejected an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range, as well as proportionate justifications for departures, the latter being inconsistent with Booker. See Gall, 552 U.S. at 41.

The Supreme Court further instructed that a district court should begin by correctly calculating the applicable guidelines range and should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. Id., *citing* United States v. Rita. In so doing, the district judge *may not presume* that the guidelines range is reasonable. Id. at 41. Further, 18 U.S.C. § 3582 directs the Court in considering the factors under § 3553(a), and, when determining whether to impose a term of imprisonment, to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Clearly, as these Supreme Court decisions demonstrate, sentencing courts have much greater discretion than they had in the past, since Booker eliminated the mandatory nature of the guidelines and made them merely advisory. The Court has also rejected both a "presumption of

3

reasonableness" as to the guidelines range, and a requirement of "extraordinary circumstances" before a sentencing court may deviate from the guidelines. Thus, an *individualized assessment* of the facts and the *defendant* is key to determining the appropriate sentence in a particular case.

It is respectfully submitted that, applying the rules of the Supreme Court in Gall and Rita, a non-guidelines sentence in this case will satisfy the goals of sentencing and serve the interests of justice.

**Applicable Guidelines Range**

As set forth above, the advisory guidelines range is 70 - 87 months. Significantly, however, the Probation Department wrote that the "guideline range would appear more harsh and severe for this defendant relative to most others" (PSR, page 17). The guidelines range is significantly higher than the 57 - 71 months that was the range agreed upon by the parties in the plea agreement and deemed sufficient for this offense.

Notably Mr. Cela, at the time of his arrest and by a later proffer agreement, immediately admitted to the crimes and engaged in extensive discussions with the prosecutor and law enforcement officials assigned to this case, cooperating and assisting them in the investigation of this matter. Defendant therefore respectfully submits that the Court should consider the terms of the plea agreement and the sentencing range set forth there, i.e., 57 - 71 months, as the one on which it should base any sentencing decisions when considering the applicable guidelines range, and, further, that the court not impose any guidelines suggestion that exceeds 57 - 71 months.

**Considerations Under 18 U.S.C. § 3553(a)**

Section 3553(a) provides that "the Court shall impose a sentence *sufficient, but not greater than necessary,* to comply with the purposes" of (1) punishment and fostering respect for the law; (2) deterrence; (3) protection of the public; and (4) rehabilitation. 18 U.S.C. § 3553(a)(2) (emphasis added). In determining the *minimally sufficient sentence* to be imposed, the court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

As the Second Circuit noted in Crosby, without the mandatory duty to apply the guidelines, consideration of the other section 3553(a) factors "acquires renewed significance." Crosby, 397 F.3d at 111, *see also,* United States v. Lake, 419 F.3d 111, 114 (2d Cir. 2005). As noted, *supra,* the recent Supreme Court sentencing decisions underscore the renewed significance of the sentencing factors other than the advisory guidelines.

Under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory language overrides the advisory policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. See U.S.S.G. § 5H1. These factors are precisely "the sort of characteristics a court is likely to find relevant when determining the 'history and characteristics

4

of the defendant' as required by § 3553(a)(1)." United States v. Simon, 361 F.Supp.2d 35, 40 (EDNY 2005).

It is respectfully submitted that after consideration of the relevant factors as to Mr. Cela, the Court should find that a sentence of Probation is sufficient to address all of the sentencing goals.

### 1. History and Characteristics of the Defendant

Xhevdet Cela is a thirty year-old Albanian-American Muslim male who is the product of a marriage in which Mr. Cela's father abused his mother mentally and physically throughout Mr. Cela's childhood. According to Mr. Cela's mother, as the eldest of her children, he became a paternal figure to his younger siblings. As she writes, "[h]is father was never around for his family. He was mentally and physically abusive to his children and to me. Xhevdet has seen firsthand the physical and mental abuse I went through with my husband. He always tried to protect me, even as a young child."

When the father was present, not only was he abusive to Mr. Cela, his mother, and his brothers, but the father enforced his Albanian-Muslim culture's insistence that a father's sons must obey and respect him under any circumstances. Thus, aggression and negative behavior was promulgated by Mr. Cela's own father's conduct, and Mr. Cela's life progression from such an upbringing readily explains why Mr. Cela made the mistakes that he did.

Following the example of his father, he acted out violently in his early years (17 to 19 years of age). Despite his early arrests for violent episodes, Mr. Cela was still a father figure to his younger brothers and a financial and childcare resource to his mother, all of whom had come to rely on Mr. Cela for leadership and support due to his father's emotional, physical and economic abandonment of the family. From 1999 through 2005, Mr. Cela worked as a porter, an elevator attendant, and as an independent roofer. As Mr. Cela's aunt Argentina writes, "he acted as if he was head of the household" after his parents' divorce. The pressures from these responsibilities, paired with the bad example set by his father, spurred anger, resentment and aggression that caused his violent outbursts, and resulted in two misdemeanor assault convictions.

Realizing that the violence of his father was not a solution to his issues in having to grow up fast, Mr. Cela started to use marihuana to dull the effects of his everyday responsibilities, as is evidenced by the three marihuana arrests reported when Mr. Cela was between 20 and 27 years of age. It was with marihuana that Mr. Cela realized he could sell the substance he was addicted to in order to pay for the marihuana he needed to use as an addict.

Then, as related by Mr. Cela to the prosecutor and the law enforcement officials assigned his case at his proffer, in 2006, Mr. Cela had hurt his leg, and doctors began to prescribe him percocet for the pain. Mr. Cela became immediately addicted to the percocet. Marihuana addiction evolved to percocet addiction, and percocet addiction later evolved to oxycodone addiction by 2008 when doctors began to prescribe him the oxycodone.

5

As his family issues went unaddressed, and his addiction deepened, Mr. Cela's poor life decisions worsened.  Because of his limited education and employment possibilities in his early youth, most of Mr. Cela's employment between 1999 and 2010 were in temporary positions, usually in the construction industry.  As he felt guilty about taking help from his already over-burdened mother, he allowed opiate addiction to "medicate" him and consume his life.  He began lying to his mother about his whereabouts.  He removed himself from all his family's problems and the stress.  At this time, Mr. Cela was not able to obtain gainful employment or save money.  He could not maintain a stable or rewarding romantic relationship with anyone.  In sum, Mr. Cela began to give up on himself and his family as he fell into the vicious cycle of selling enough oxycodone pills in order to pay for his addiction.

In 2007, Mr. Cela was given a good business opportunity when a family friend needed a considerable amount of construction work done.  This explains how Mr. Cela was able to earn over $160,000.00 in 2007.  However, after he completed the work, Mr. Cela's addiction prevented him from building his business, as he plunged deeper and deeper into the alternating worlds of euphoria and deep depression associated with opiate abuse.

By 2010, Mr. Cela had allowed the vicious cycle to turn him into a full-fledged oxycodone dealer.  However, he was using as much as he was dealing.  As he related in his proffer, because he had no medical insurance, Mr. Cela had to visit several doctors in order to obtain the quantity he needed to satisfy his own addiction, while being able to sell enough to pay for the next prescription.  By this point in his life, he was practically living as a squatter in a back room basement of his brother's deli business, counting the amount of oxycodone he needed to satisfy his addiction (more than five oxycodone pills per day), while maintaining enough to sell off.  Mr. Cela had started his own business, Pro-Star Home Improvement Corp., at around this time, but could only earn $5,500.00 in income over the course of one year.

With his becoming a full-fledged oxycodone addict and dealer by 2010, it is easy to understand why Mr. Cela writes in his letter to the court, "In a sort of good way this arrest was a blessing in disguise, if it wasn't for the arrest I would have not seen what the drugs were really doing to me; the arrest pointed me in the right direction."  Realizing immediately that the arrest had in some sense freed him, Mr. Cela immediately confessed to his wrongdoing when he was arrested.  Before even having obtained counsel, Mr. Cela told his arresting officers that he wanted their help in fixing his life, and that he wanted to tell them everything he knew about illicit oxycodone distribution in Staten Island.  Mr. Cela stood by this offer when he submitted himself to a proffer on October 19, 2011, with the prosecutor and the law enforcement officials who arrested him.

Realizing that he could no longer derive income from the illicit drug trade, Mr. Cela built upon the business he had started (Pro-Star Home Improvement Corp.), establishing a business address at 181 Liberty Avenue, Staten Island, New York, and deriving more income from the business as he has recovered from his oxycodone addiction.  Mr. Cela has a working business checking account balance with TD Bank of $12,327.20.  Mr. Cela has recently been able to save money, something he was never able to do before as an oxycodone addict.  His savings account balance is now $37,549.87.  The value of the tools that he has saved for to buy for his business is about $30,000.00.  Mr. Cela maintains and contributes now to his one-third interest in his family's home in Freehold, New Jersey.

Mr. Cela has been free of the influence of any narcotic or opiate substances since his arrest. This is evidenced by the facts that he has been able to build his business, re-establish his close personal bonds with his family, and stay out of trouble. Indeed, Mr. Cela has not been re-arrested since he was arrested for this case over two years ago. Since the time that he has been under pre-sentence probation supervision, Mr. Cela has complied with every requirement, and has been found to be consistently testing drug-free.

After his arrest, Mr. Cela met and has been involved in a romantic relationship with Jasmine Kacic, who has written and submitted a letter to this court in support of Mr. Cela. Although Ms. Kacic suffers from a severe liver illness, Mr. Cela has remained as committed to Ms. Kacic as to any member of his family. Ms. Kacic is very supportive to Mr. Cela as he maintains his sobriety, while they work together to treat her illness. Both Mr. Cela and Ms. Kacic attend the College of Staten Island. Mr. Cela is determined to obtain a college degree.

Since the arrest, Mr. Cela has retained all of the positive aspects of being a family leader without the negative feelings of insecurity, insufficiency or guilt. As demonstrated by the numerous letters from family and friends, Mr. Cela is a loving and hardworking man that is an active role model for everyone in his family, as he has been able to persevere past violence, substance addiction, and an arrest to become an asset to his family and his community. His friends and family describe him as considerate, thoughtful and reliable. Additionally, a lot has changed in the two years that this case has been pending. The burden on him to act as a father figure to his younger brothers has lessened as he has learned to take care of himself first, as his mother's ability to provide for the family has improved, and as she has learned to rely less on Mr. Cela.

Mr. Cela's enrollment in the Bridge Back to Life Center drug program demonstrates his commitment to maintaining a sober, law-abiding lifestyle. Since he voluntarily entered the program, he has been free from drugs and alcohol, consistently testing negative in drug tests administered to him by the program. Mr. Cela regularly attends group and individual therapy sessions there, and the therapist wrote in a letter of support for Mr. Cela that he "has gained insight into his relapse triggers and the disease of addiction that can lead him back to drug and alcohol use." The therapist further states that Mr. Cela "shows signs of humility when interacting with staff as well as other clients. Humility is a *(sic)* excellent asset to have in recovery."

## 2. Nature and Circumstances of the Offense

The facts of this case are noted above at the outset of this memorandum.

As the facts demonstrate, Mr. Cela was not a leader or a participant in a well-organized illicit drug enterprise. Rather, he was obtaining the drug from his own prescriptions and from others who received the drug through prescriptions. Mr. Cela and his co-defendant, Mr. Alterman, sold the oxycodone pills themselves. They used no underlings, and they answered to no one above them. They made just enough money to cover their addictions, and were not able to invest their illicit proceeds into any other legitimate or illegal enterprise.

7

At first, law enforcement officials tried to characterize K-MOB as an ethnically-closed group of Albanian males that distributed narcotics in Staten Island. On the contrary, K-MOB is currently the name of a music group that Defendant actively and currently participates in. They write and produce music. K-MOB, in its present form as a musical group, is comprised of only three other people: Ajri Ismaili (Mr. Cela's friend), Vincent Orlando (Mr. Cela's brother-in-law, who is not related to this author), and Defendant's little brother. None of the other three have a criminal record. At most, one of them was previously arrested for marihuana possession, and that case was dismissed. Thus, the alleged connection between them and a gang identified by law enforcement as "K-MOB" was fallacious.

The music group takes its name from a group of neighborhood youths that congregated next to a K-Mart, taking the "K" in K-MOB from the "K" in K-Mart. K-Mart is a focal point for youths to congregate in the New Dorp section of Staten Island. Some of the youths were employees at the K-Mart. All were mutual friends who knew each other from the neighborhood and/or the neighborhood schools. They often went to the fast-food restaurants, theaters, and stores in the area. To Defendant's knowledge, he and the co-defendant in this case were the only youths from this group who were ever arrested for oxycodone or other narcotic distribution.

Most of the people who considered themselves K-MOB members in their teenaged years are now men who are married, have children, own businesses or work, and rent or own their own residences. They are law-abiding members of the community, and none are known to be narcotics distributors or members of any organized criminal network. If any of these men were approached today, they would scoff at the idea that the name "K-MOB" pertains to a criminal organization.

Defendant never sold to anyone who was ever associated with K-MOB. To do so would have been to risk becoming a social outcast. K-MOB members knew each other's family and friends. If Defendant were to sell to any of them, he would have suffered great shame and embarrassment, and would have been ostracized from his social circle. K-MOB members would have told Defendant's family if he tried to sell to any of them, something the Defendant would do all in his power to prevent. Indeed, to this day, Mr. Cela has not told any of his friends and associates who he befriended from the days of hanging out near K-Mart about his arrest and conviction because of his shame and embarrassment.

Indeed, despite law enforcement's claims that K-MOB was an organized criminal network that distributed drugs, no other arrests linked to K-MOB have ever been made, and to the best knowledge of this author and Mr. Cela, no further investigations have been made into ethnic Albanians that Mr. Cela is close to or even knows of.

Defendant never "packaged [oxycodone pills] for distribution" as claimed by the PSR on page 5, Paragraph 7. He was never that organized in his sales of the pills. Since they were pills, they did not need to be "packaged." Thus, the assertion in the PSR that he could not provide the pills in a certain quantity to a caller because they were "already packaged for distribution" is an inaccurate portrayal of the Defendant's reason for not having enough pills to sell at that time. More likely, he did not have the number of pills the caller was seeking because he had used them himself.

8

Defendant did not have a distribution system or network. Indeed this is supported by the fact that the recordings would not show that Defendant worked with any other person besides his former best friend and co-defendant, Igor. A vast majority of the calls would reveal that Defendant more often worked on his own, selling enough pills to support his habit of having to pay for the prescription for the next batch.

In paragraph 14 of the PSR (page 6), it is claimed that the deli "was being used as a location to receive, store and distribute oxycodone pills by the defendant." Defendant denies this claim. The only place he "received" pills was from the pharmacy and he "stored" the pills on his person or in his personal effects, wherever he was at that moment in time, whether it be his room behind the deli when he was working, or the basketball court if he was playing with his friends. No one else "distributed" the pills other than he.

When law enforcement raided the deli on the day that Defendant was arrested, no illicit substances were recovered from the deli itself. Only Defendant's pills were recovered from Defendant's personal effects in a part of the building that Defendant slept in that was separate and apart from the deli space. Defendant was sleeping at the building at that time, as set forth above, because he did not want his mother and the rest of his family to see his deteriorating lifestyle that was being caused by his addiction.

Thus, the nature and circumstances of the offense demonstrates that it was a two-man operation in which both men who operated it were pathetic, isolated drug addicted young men, one of which was Mr. Cela, who was barely subsisting on a vicious cycle of selling his prescription drugs to support his addiction, and not an organized criminal enterprise that churned a profit distributing drugs to a great number of individuals.

### 3.   Punishment, Deterrence, Protection of the Public and Rehabilitation

A sentence of any amount of jail time for Mr. Cela would be needlessly and overly punitive, and would not appropriately serve the other sentencing goals. Moreover, his being incarcerated would not only affect him, but also his fiancee, his mother, his two brothers and other family members whose lives he has touched. A sentence of any jail time would be a harsh penalty that would affect the lives of all members of his family.

Mr. Cela, his mother, and younger brother own a mortgaged home in Freehold, New Jersey. His younger brother is not able to contribute to the mortgage at this time, so Mr. Cela and his mother share equally in a $2,500.00 per month mortgage payment. While Mr. Cela's mother is gainfully employed, the family is able to save little, and Mr. Cela's contributions to the mortgage allow his family to subsist paycheck to paycheck. For Mr. Cela's mother to be suddenly forced to maintain the household on her own, on one salary, would pose a financial hardship that could lead to the loss of their home.

A sentence of jail time would further be counterproductive, both for Mr. Cela and for society, for it is unlikely that he would be able to return to his present employment because he is the sole owner and operator of his business, and it would be virtually impossible to rebuild the business after any period of incarceration.

Incarceration would further be a needless waste of taxpayer money, particularly for someone such as Mr. Cela who is a contributing and productive member of society. Mr. Cela's history demonstrates that he poses no danger to society, and, as the enclosed letters demonstrate, he has, in fact, devoted much of his time to overcoming his drug addiction, building his construction business, and helping his family and others.

Deterrence is also not a significant issue in this case, as it is not likely Mr. Cela will recidivate. He has spent the last two years that this case has been pending addressing his drug addiction and building his business, staying out of trouble, and focusing on his familial relationships that matter so much to him. Indeed, Mr. Cela has certainly been deterred enough by the cloud that has hung over his life for these past 24 months since his arrest, and the emotional toll on his family life with the threat of all he and they stand to lose if he is incarcerated. Additionally, in speaking to younger family members and friends and to his co-patients in his drug treatment program about his transgressions, Mr. Cela has served as a cautionary tale to those around him, thereby deterring them from going down the wayward path Mr. Cela wandered.

Additionally, sentencing Mr. Cela to a period of incarceration would not be sending a message to any criminal associates because Mr. Cela, as discussed above, did not conduct his illegal activities with any other associates other than Mr. Alterman, and they were not part of any organized effort to distribute oxycodone. Thus, any deterring effect on a criminal associattion, etnerprise, or gang would not be accomplished by sending Mr. Cela to prison.

Further, this case did not garner any coverage in the press, nor is it expected to after sentencing. As such, any deterring effect on the public is not likely to occur even with a sentence of incarceration.

Nor does Mr. Cela require education or rehabilitation. He already obtained his GED and has construction job skills and a construction-related business which will keep him gainfully employed for the rest of his adult life. Mr. Cela does not need additional rehabilitation other than services recommended by the Probation Department during a sentence of probation because he has rehabilitated himself by attending a drug program on his own, by staying out of trouble and not being arrested for the two full years that this case has been pending, and by adhering to all the rules and regulations that have been imposed by the Probation Department while the department was supervising Mr. Cela.

In deciding the sentence herein, the Court should and must look at the *entirety* of the person Xhevdet Cela is.

Notably, Xhevdet Cela is not a man who has become a virtual ward of the state. Instead, he is hard-working and resourceful, a man who has used a terrible setback such as an arrest and ultimate conviction for a federal crime to serve as an impetus to overcome drug addiction and rebuild a business he had practically given up on. Xhevdet Cela is not a man who abandoned his family and loved ones -- although that is what his father did to the Cela family. Xhevdet Cela is not a man who abused his family -- although that is what his father did to him and his family during their formative years.

10

Rather, Xhevdet Cela is a man who is always out in his community, helping people, making things better, treasuring every moment with his family, and he is a man who has made a terrible and humiliating mistake and has been paying for it in so many ways since he was arrested, and will continue to do so for the rest of his life regardless of the sentence imposed herein.

**Conclusion**

As written by our social worker, James Boyle, in the attached mitigation report, Mr. Cela's "hope in his future and in his potential to permanently reclaim his life as a productive, law abiding citizen will increase enormously if this Court, having learned his story, imposes a sentence that says to this highly motivated 30 year old:  We see that you are genuine in your desire to overcome your addiction and we believe that you have the capacity to continue to rehabilitate yourself and to resume life as a law-abiding citizen."

In his criminal endeavors, Mr. Cela was motivated more by his addiction to the oxycodone he was selling than by any profit he could make by selling it.  Indeed, he was not living like some moneyed drug dealer.  Rather, he was living a solitary lifestyle in a back room of his family's deli.

Mr. Cela's arrest in this case woke him up, and helped put him on the road to recovery.  As pointed out in the mitigation report, Mr. Cela has the "four major domains that support recovery" in place.  The federal government's Substance Abuse and Mental Health Services Administration (SAMHSA) promulgated these four major domains in its Unified Working Definition and Set of Principles for Recovery report that was released in 2011.  These domains are health, home, purpose and community.

"**Health**" is overcoming one's disease or managing one's disease as well as living in a physically and emotionally healthy way.  Mr. Cela has accomplished this by staying drug free, and by not getting arrested, for the two years that this case has been pending, as well as by entering the Bridge Back to Life program and consistently testing negative on all drug tests.

"**Home**" is living in a safe and stable place that supports recovery.  There is no doubt that this has been accomplished in Mr. Cela's case.  He still lives with his mother and extended family, all of whom love and support him, as evidenced by the letter submitted by his family.  In his "home" he is a hardworking, insightful, and supportive son, brother, nephew and cousin who is inspired by the love and support of his family.  Mr. Cela has also entered into a romantic relationship with Ms. Kacic that has supported him and helped him flourish over the last two years. Ms. Kacic's struggle with liver disease, while an obvious setback to her and Mr. Cela, is something that has brought out the empathic, supportive side that Mr. Cela has always had, from the early days of his family when he had to assume the role of an adult when his father abused and then abandoned his family.  As his aunt BarbuqeMati wrote in her letter of support for Mr. Cela, "Xhevdet is a kind of person that is there when you need him at good and bad times.  If he gives you a promise you can rely on it."

"**Purpose**" is meaningful daily activities, such as a job, school, volunteerism, family caretaking or creative endeavors, and the independence, income and resources to participate in society.  Mr. Cela's work ethic and his history of gainful employment and generosity to family

members establish that he has accomplished this element. In addition to starting and expanding his own construction business, Mr. Cela is working on obtaining a college degree from the College of Staten Island.

**"Community"** pertains to relationships and social networks that provide support, friendship, love and hope. In addition to his extensive and support family connections, Mr. Cela is deeply connected to the workers and clients at his program Bridge Back to Life. In addition to his family, Mr. Cela gets great support and friendship from the bonds he has forged during his therapy and drug treatment. His expanding business has also put him in contact with clients who use his services and come to understand how good a worker he is, as they refer him to others.

For all of the foregoing reasons, it is submitted that a sentence of Probation is "suficient, but not greater than necessary" to achieve the goals of sentencing, and it is respectfully requested that the Court impose such a sentence.

The Court is not bound to accept the advisory guidelines range, either pursuant to the plea agreement or the calculation of probation, and the permissible exercise of the Court's discretion in sentencing is particularly significant in the case of someone like Mr. Cela, who has overcome the oxycodone addiction that once fueled his illegal activities, who has become a productive member of society, and upon whom his family depend for emotional as well as financial support.

Such a sentence will also save the taxpayers the expense of incarcerating Mr. Cela for a period within the advisory guidelines range, or for any period of time, however minimal, while also allowing him to continue to work in his current employment and to pay court-imposed fines.

It is therefore respectfully requested that the Court impose a non-guidelines, non-incarceration sentence of Probation, and it is submitted, in light of all of the foregoing factors, that such a sentence would adequately serve the sentencing goals of 18 U.S.C. § 3553 and the interests of justice.

                Respectfully,

                JOHN J. ORLANDO, ESQ. (JO-3242)
                Attorney for the Defendant

cc: Brendan King, AUSA

Defense Sentence Brief:
Michael Solomon,
Legal Intern
John Orlando Law Office
University at Buffalo School of Law
*Juris Doctor* Candidate, 2015